**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| AIR EVAC EMS, INC., d/b/a Air Evac Lifeteam and AirMedCare Network, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) Civil Action No. ___2:21-cv-310___ |
| JAMES A. DODRILL, in his official capacity as West Virginia Insurance Commissioner, | ) ) ) ) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Air Evac EMS, Inc. ("Air Evac"), by and through its attorneys, alleges as follows:

### INTRODUCTION

1.      In March, this Court enjoined the Offices of the Insurance Commissioner's (OIC's) effort to regulate air-ambulance membership programs in violation of the Airline Deregulation Act of 1978 (ADA), and in disregard of the Fourth Circuit's ruling in *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751 (4th Cir. 2018). *Air Evac EMS, Inc. v. Dodrill*, No. 2:21-CV-00105, 2021 WL 781679 (Mar. 1, 2021), *appeal docketed*, No. 21-1301 (4th Cir. Mar. 19, 2021) ("*Dodrill I*"). This new suit is needed because West Virginia and its Insurance Commissioner, Defendant James Dodrill, have once again targeted air-ambulance membership programs for regulation under the West Virginia Insurance Code, W.Va. Code § 33-1-1 *et seq.*.

2.      As established in *Dodrill I*, Air Evac is an emergency air-ambulance provider that offers life-saving emergency transportation and in-flight care to critically ill and injured patients throughout the country, including in West Virginia. Air Evac is also a federally-regulated air carrier for purposes of the express-preemption provision of the ADA. Accordingly, States "may not enact or enforce a

1

law, regulation, or other provision having the force and effect of law related to" Air Evac's "price[s],

route[s], or service[s]." 49 U.S.C. § 41713(b)(1); *Cheatham*, 910 F.3d at 766–69.

3.      Air Evac provides an essential service in rural West Virginia. As the Fourth Circuit put

it, "particularly in rural areas, air ambulances can play a vital and life-saving role in responding to

medical emergencies." *Cheatham*, 910 F.3d at 757.

4.      To make its life-saving care affordable for all rural West Virginians, Air Evac offers a

prepaid, discounted Membership Program to both individual West Virginia residents and to West

Virginia businesses and municipalities (which can purchase a membership on behalf of their employees

or citizens). In exchange for a small, prepaid membership fee (less than $100 per year for an individual

member and their household), Air Evac considers any charges for the member's emergency

transport—beyond any amount paid by the member's insurer or other third parties—to be paid in

full. The Program is essentially a debt-cancellation agreement: in exchange for the prepaid membership

fee, if a member is transported by Air Evac (or an Air Evac sister company), then Air Evac (or the

Air Evac sister company that is the transporting provider) will cancel the portion of the bill that would

otherwise be the patient's out-of-pocket responsibility, including any co-pay, deductible, or balance

that is not covered by the patient's insurance. The Membership Program is the largest of its kind in

the nation, and several West Virginia municipalities have purchased these memberships to ensure that

their residents have affordable access to life-saving emergency air-ambulance services.

5.      Federal courts—including the Fourth Circuit, the Eighth Circuit, and this Court—

have repeatedly held that efforts to regulate the Membership Program are subject to ADA preemption.

*Cheatham*, 910 F.3d at 767-69; *Guardian Flight LLC v. Godfread*, 991 F.3d 916, 922 (8th Cir. 2021); *Dodrill

I*, 2021 WL 781679, at *9-10 (holding that the application of West Virginia insurance laws to Air Evac's

Membership Program was likely preempted by the ADA, and enjoining their enforcement).

6.      Notwithstanding the ADA, West Virginia officials have subjected Air Evac to a years'-

long legal and regulatory attack against its prices, its services, and its Membership Program.

7.      That began with the *Cheatham* litigation. In *Cheatham*, the Fourth Circuit affirmed an injunction by this Court holding that the ADA preempted a West Virginia law that capped air-ambulance reimbursement for certain transports at the amount of the patient's annual membership dues. 910 F.3d at 767; *Air Evac EMS, Inc. v. Cheatham*, 2017 WL 4765966, at *10 (S.D. W. Va. Oct. 20, 2017), *aff'd*, 910 F.3d 751 (4th Cir. 2018) (holding that ADA preempts "[W. Va. Code] §5-16-8a(b)'s regulation of Air Evac's subscription agreements" and enjoining state defendants from enforcing it).

8.      Defendant Dodrill and OIC then undertook to regulate Air Evac's Membership Program using "another method," *Dodrill I*, 2021 WL 781679, at *6: this time, by designating the Membership Program as "insurance" and subjecting it to regulation as such.

9.      As the Commissioner explained to executives of Air Evac's main competitor in West Virginia, he planned to take "a two-pronged approach": *first*, an administrative proceeding "to shut down" the membership program "on the basis [that] they are unlicensed insurance products sold by unlicensed insurance producers"; and *second*, "model legislation" targeting the Membership Program "that we might be able to introduce in the upcoming legislative session." Ex. A (7/17/2019 email).

10.     True to his word, Defendant Dodrill then launched the Prong 1 of his campaign.  He initiated an investigation and proposed administrative proceeding against Air Evac to (1) classify the Membership Program as "insurance" under state law; (2) require Air Evac to obtain an insurance license, and comply with all relevant regulatory requirements, to continue offering memberships in West Virginia; and (3) penalize Air Evac for past membership activities conducted without a license.

11.     On March 1, 2021, this Court issued a preliminary injunction forbidding Defendant Dodrill from enforcing the challenged provisions of the Insurance Code—the "Licensing Laws"—against Air Evac. *Dodrill I*, 2021 WL 781679, at *10. This Court concluded that the circumstances of Defendant Dodrill's actions against Air Evac were "troubling"; that OIC's efforts to avoid *Cheatham*

"smack[ed] of gamesmanship"; and that Commissioner Dodrill's "motivations" for regulating the Membership Program "are somewhat puzzling." *Id.* at *6, *10.

12.     Just weeks after this Court entered its injunction, the Eighth Circuit unanimously ruled in *Guardian Flight* that a North Dakota law banning Air Evac's Membership Program is preempted by the Airline Deregulation Act. In so doing, the Eight Circuit reversed the North Dakota district court's decision on which Defendant Dodrill had relied for his putative ability to regulate the Membership Program; and it expressly endorsed this Court's analysis. *Guardian Flight*, 991 F.3d at 923-24 (citing this Court's ruling to hold that the McCarran-Ferguson Act does not shield from ADA preemption laws regulating Air Evac's Membership Program, under which Air Evac "considers prepaid any services that it (or its affiliates) may render to members").

13.     Defendant Dodrill has now launched Prong 2 of his campaign—the "legislation" he discussed with Air Evac's competitor. It takes the form of newly-enacted House Bill 2776 ("HB 2776"), which is effective on July 9, 2021. HB 2776, 85th Leg., Reg. Sess. (W. Va. 2021) (*to be codified* at W. Va. Code § 33-11B-1) (Exhibit B). HB 2776 was drafted by Air Evac's in-state competitor, and OIC was involved in the enactment process from beginning to end.

14.     In combination with existing provisions of the Insurance Code, HB 2776 purports to deem air-ambulance membership programs "insurance" under West Virginia law; requires air-ambulance providers to obtain a license from Defendant Dodrill and submit to onerous Insurance Code requirements on an ongoing basis; and empowers Defendant Dodrill to issue regulations to implement the statute's terms. Ex. B. HB 2776 and these existing provisions of the Insurance Code—all of which Air Evac challenges here—are referred to in this Complaint as the "Membership Laws."

15.     HB 2776 is nothing short of an effort to circumvent this Court's ruling in *Dodrill I* and regulate the Membership Program under the Insurance Code. As the Commissioner testified during the legislative hearings on the bill, he expected the bill to "negate" *Dodrill I*. Ex. C (3/9 Hearing 20:11-

14). And there is no question that Defendant Dodrill intends to enforce HB 2776 against Air Evac. As Dodrill testified when he was asked what air-ambulance company the bill would affect: "In West Virginia, I think there's only one." Ex. C (3/9 Hearing 21:16-20). That is Air Evac.

16.    But this workaround is doomed to fail, because just as this Court previously held, "[t]he effort to regulate Air Evac's Membership Program clearly relates to a price of an air carrier providing air transportation." *Dodrill I*, 2021 WL 781679, at *7. And once again, the McCarran-Ferguson Act does not save HB 2776 or the provisions of the Insurance Code it would make applicable to Air Evac's membership from preemption, because the membership is not the "business of insurance" within the meaning of that federal statute—and no state law can alter that conclusion.

17.    HB 2776 goes into effect July 9. If it is allowed to do so, Air Evac will be in the same place it would have been if the *Dodrill I* injunction had never issued: forced to either cease operating its Membership Program, or face penalties, as a result of a plainly preempted state law. This Court should not let that happen.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action for declaratory and injunctive relief under 28 U.S.C. § 1331. This case raises important federal questions including whether the ADA, 49 U.S.C. § 41713(b)(1), preempts the Membership Laws because they are "related to" the prices and services of federally registered air carriers. When a plaintiff seeks a declaratory judgment that state laws or regulations are contrary to federal law, and also an injunction prohibiting a state official from applying or enforcing those laws and regulations, there is "no doubt that federal courts have jurisdiction under § 1331 to entertain [the] suit." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002) (citing *Shaw v. Delta Air Lines Inc.*, 463 U.S. 85, 96 n.14 (1983)); *see, e.g.*, *Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 638–42 (S.D. W. Va. 2017) (entertaining ADA preemption suit seeking declaratory and injunctive relief against West Virginia officials).

19.    Pursuant to its equitable powers, this Court may grant injunctive relief against state officers who are violating, or planning to violate, federal law. *See Verizon Md., Inc.*, 535 U.S. at 645 (courts may grant such relief, under *Ex parte Young*, 209 U.S. 123 (1908), so long as the plaintiff has alleged a "violation of federal law and seeks relief properly characterized as prospective"); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action"); *Cheatham*, 260 F. Supp. 3d at 638–42. Under 28 U.S.C. Section 2201, this Court may also grant appropriate declaratory relief under these circumstances. *Verizon Md.*, 535 U.S. at 645–46; *Cheatham*, 260 F. Supp. 3d at 641–42.

20.    Venue is proper under 28 U.S.C. § 1391(b) because the Southern District of West Virginia is where Defendant performs his official duties and where a substantial part of the events giving rise to the claim occurred.

## PARTIES

21.    Plaintiff Air Evac EMS, Inc. d/b/a Air Evac Lifeteam, is a Missouri corporation with its principal place of business in O'Fallon, Missouri. Air Evac provides air-ambulance services in states around the country, including West Virginia.

22.    Defendant James A. Dodrill is the West Virginia Insurance Commissioner and head of the Offices of the Insurance Commissioner. He is empowered to enforce the West Virginia Insurance Code and investigate violations thereof. W. Va. Code §§ 33-2-3, 33-2-11, 33-2-3a. Defendant Dodrill enforces the Membership Laws challenged here; he is specifically empowered to issue regulations implementing HB 2776; and he may pursue a cease-and-desist order; injunctive relief; civil penalties; and criminal penalties against a party that transacts insurance without a license. W. Va. Code §§ 33-2-11; 33-3-1; 33-44-6, 33-44-7, 33-44-9; 33-11-7.

## STATEMENT OF FACTS

I.     **Air Evac, a Federally Regulated Air Carrier, Offers Life-Saving Air-Ambulance Services in West Virginia and Around the Country**

23.     Air Evac provides air-ambulance services around the country, including in West Virginia. Air Evac operates pursuant to an air carrier operating certificate issued by the Federal Aviation Administration ("FAA") under 14 C.F.R. Part 119. Also known as a "Part 135" certificate, this authorizes on-demand service in accordance with the FAA's rules in Part 135. Ex. D (Air Evac Part 135 Certificate). Under the related FAA Operations Specifications, Air Evac is authorized to provide on-demand air-ambulance services in the 48 contiguous United States and the District of Columbia. Ex. E (FAA Operating Specifications). Air Evac also has an economic authorization from the federal Department of Transportation ("DOT")  to operate as an "air taxi" under 14 C.F.R. Part 298, meaning it is authorized to transport persons or property and does not engage in regular round-trip flights. Ex. F (Part 298 Certificate).

24.     Under the ADA, the federal DOT possesses economic regulatory authority over air carriers. *See* 49 U.S.C. § 40101(a). The Secretary of Transportation is empowered by statute to ensure that air carriers—including, specifically, air-ambulance operators—do not engage in any unfair or deceptive practices or utilize unfair methods of competition or harm consumers. *See* 49 U.S.C. § 41712(a). That includes the authority to issue an order requiring air carriers to cease any "practice or method" the Secretary deems unlawful, deceptive, or unfair. *Id.* DOT also offers an on-line complaint form, through which complaints against air-ambulance providers can be submitted to the Office of Aviation Consumer Protection—which, in turn, "may pursue enforcement action." *See* DOT, *Aviation Consumer Protection – Air Ambulance Service – Air Ambulance Complaints*, tinyurl.com/56hzhfb7.

25.     Through the FAA Reauthorization Act of 2018, Congress "addresse[d] air ambulances directly," and "took many steps to respond" to issues in the industry. *Cheatham*, 910 F.3d at 757, 766; *see* Pub. L. No. 115-254, § 101 *et seq.* (2018) ("FAA Reauthorization Act"). Among other things, the

Act required DOT to form an air-ambulance Advisory Committee to address balance billing and consumer protection issues in the air-ambulance industry, with States represented on the Committee and able to submit complaints about air ambulances to DOT. FAA Reauthorization Act §§ 418(a), (b)(3)(B); 420(b)(2). The Act anticipates that the Advisory Committee will submit a report to DOT, HHS, and Congress, with DOT issuing potential *federal* regulatory guidance based on the Advisory Committee's recommendations. FAA Reauthorization Act, § 418(e)-(f). The Act also created a new Aviation Consumer Advocate within DOT's Aviation Consumer Protection Division, whose function is to help consumers file complaints as needed against air carriers and to identify ways DOT can "improve" on "protection of air ambulance consumers." FAA Reauthorization Act, § 424(c).

26.    The Advisory Committee envisioned by the Act is tasked with, among other things, making recommendations regarding "options, best practices, and identified standards to prevent instances of balance billing," including—specifically—"explanation of . . . subscription programs to consumers." FAA Reauthorization Act, § 418(d)(2). Consistent with its mandate, the Committee tasked one subcommittee with making consumer-protection related recommendations regarding air-ambulance membership programs. That subcommittee's report was released in January 2021. *Report on Disclosures and Distinction of Charges* at 18-19, Subcommittee on Disclosures and Distinction of Charges and Coverage for Air Ambulance Services (Jan. 2021), https://downloads.regulations.gov/DOT-OST-2018-0206-0026/attachment_2.pdf.

27.    Air Evac conducts some transports across state lines, including from the site of an emergency in one state to a medical facility in another state. Other flights occur within a particular state.  But Air Evac operates all of its flights under the authority of the FAA and DOT.

28.    Courts have unanimously found that air-ambulance providers—including Air Evac—are "air carriers" for purposes of ADA preemption. *See*, *e.g.*, *Cheatham*, 910 F.3d at 764 ("On this question, the plain text of the law, the overall structure of the federal aviation laws, and the subsequent

acts of Congress all point in the same direction: air ambulances are within the scope of the ADA.").

29.     Air Evac maintains a fleet of air ambulances ready to respond at a moment's notice to medical emergencies, often in rural or remote locations that lack appropriately advanced medical services (*e.g.*, trauma hospitals and burn centers). Air Evac's air ambulances quickly transport patients—regardless of their ability to pay—facing serious or life-threatening emergencies, while providing medical care during the flight.

30.     Air Evac provides transports in medically necessary, emergency cases where a higher level of care is needed and ground transportation would be too slow and risk imperiling the life of the patient. As such, the services Air Evac supplies radically improve patient outcomes and reduce the overall cost of care. In short, Air Evac's air ambulances save lives.

31.     As an emergent care provider, Air Evac may be dispatched by first responders, the emergency department of a hospital, or by an attending physician. Air Evac does not self-dispatch.

32.     Where a covered hospital or attending physician orders a transport, the regulations and procedures set out by the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, generally apply. Moreover, under state law, air-ambulance providers are generally required to transport patients regardless of their insurance status or ability to pay. *See*, *e.g.*, W. Va. Admin. Code § 64-48-7.2.9 (emergency medical services personnel may be disciplined for refusing to "render emergency medical care because of a patient's . . . . financial inability to pay"). In keeping with federal and state law, Air Evac transports patients regardless of their insurance status or ability to pay.

33.     Providing this life-saving care is expensive. For each air ambulance, Air Evac must acquire and customize a commercial aircraft so that patients may be transported and receive medical care in route. Each aircraft must also be constantly maintained and fueled so that it is ready to respond to emergencies at any time, day or night.

34.     Maintaining this state of readiness also requires that Air Evac staff each base with two

pilots per day, each performing 12-hour shifts, to maintain 24-hour coverage. To account for pilot time off, multiple pilots must be employed full-time at each base. And to provide the medical services necessary to treat patients at the scene of medical emergencies and during the flights, each aircraft must be staffed with highly trained paramedics and nurses. As with the pilots, multiple teams of medical personnel must be employed for each base.

35.    Air Evac is often underpaid for the services it provides to uninsured and underinsured patients. These underpayments contribute to the rising cost of air-ambulance services because—for Air Evac to stay in business—the cost of undercompensated care must be shifted to other payors such as commercial insurers.

## II.    Air Evac Offers a Membership Program to Make Sure Its Life-Saving Service is Affordable for All West Virginia Residents

### A.    Background and History of the Membership Program

36.    Air Evac has several sister air-ambulance companies, including Guardian Flight LLC; Med-Trans Corporation; and REACH Air Medical Services LLC. Throughout this Complaint, Air Evac and its sister air-ambulance companies are referred to collectively as "the Providers."

37.    The Providers are all federally-registered air carriers; each maintains a Part 135 air carrier operating certificate with the FAA, as well as a Part 298 economic authorization with the DOT. The Providers each offer transportation in largely different geographic regions in 38 States across the country. Air Evac is the only one of the Providers that has air-ambulance bases with aircraft based in the State of West Virginia. Air Evac's four West Virginia bases are located in New Martinsville, Summersville, Beckley, and Logan.

38.    The Providers are commonly owned by their parent, Air Medical Group Holdings ("AMGH") LLC. Global Medical Response, Inc. ("GMR"), is the parent company of AMGH LLC and—through it—of each of the Providers.

39.    In most states in which they operate, Air Evac and the other Providers offer a

subscription membership program ("Membership Program"). The Membership Program can be traced back to the founding of Air Evac. In 1985, three private citizens in West Plains, Missouri founded a helicopter air-ambulance service, Air Evac, "to give rural people in this south-central Missouri area better access to emergency care." McCarty, *When Seconds Count*, Rural Missouri, tinyurl.com/3t4a4nnr. To make this service financially viable, Air Evac's founders decided to sell prepaid memberships. *Id.* They borrowed this idea from the REGA Foundation in Switzerland. *See Air Evac LifeTeams Reaches the 1 Million Mark in Memberships*, Air Evac Lifeteam (Dec. 22, 2011), https://tinyurl.com/y3u8yxhm. Like REGA members, Air Evac's members paid a small annual fee; if a member was later transported, "the service [was] free" (beyond anything paid by insurance). McCarty, *supra*.

40.     Today, the Membership Program continues to operate largely as it did in the early days of Air Evac. The Providers offer the Membership Program as part of an alliance of affiliated air-ambulance providers called AirMedCare Network, which includes Air Evac, Guardian Flight, Med-Trans Corporation, and REACH Air Medical Services. Ex. G (Membership Application).

41.     AirMedCare Network has approximately 3 million members nationwide, and the Membership Program is the largest program of its kind in the country.

42.     AirMedCare Network is not a separate legal entity (*e.g.*, a limited liability company or a corporation). Rather, it is a business unit housed within the Air Evac EMS, Inc. legal entity. AirMedCare Network marketing and sales staff are generally employed by the legal entity Air Evac EMS, Inc. at its West Plains, Missouri office and across the country; and Air Evac EMS, Inc. has registered as doing business as "AirMedCare Network" in the State of Missouri. The trade name "AirMedCare Network"—which is registered with the U.S. Patent and Trademark Office and owned by GMR—is also used by the Providers to describe the alliance of the participating Providers to market AirMedCare Network subscriptions.

### B.  The Membership Program in West Virginia

43.  Air Evac has been selling memberships in the State of West Virginia since 2008. Generally speaking, Air Evac has sold and marketed two general types of membership agreements in West Virginia:  individual memberships ("business-to-consumer") and memberships for businesses, cites, and municipalities ("business-to-business"). Air Evac and the other Providers offer these same general types of memberships in other states around the country. To sell memberships in West Virginia, Air Evac employs two full-time Membership Sales Managers who are located in West Virginia. Air Evac also engages the services of 30 Independent Representatives not employed by Air Evac who sell membership agreements in West Virginia and are located there as well.

44.  Individual memberships generally work as follows: In exchange for a small fixed membership fee, amounting to less than $100 in a given year, the relevant Provider considers any emergency air-ambulance charges in excess of the amount paid by a member's contractual insurance or by other third-parties to be prepaid by the member. When an individual purchases a membership, it covers all persons in that individual's household as well.

45.  Individuals who purchase a membership from one company in the AirMedCare Network are automatically enrolled in the membership for each of the AirMedCare Network companies. Stated another way, an AirMedCare Network membership gives members reciprocal membership in each participating company's membership program. For example, in 2020, a West Virginia member whose home-state provider is Air Evac was transported by REACH while in Nevada. In such cases, REACH will categorize the flight as a member transport and cancel any out-of-pocket obligation the member would otherwise owe after insurance and other responsible third parties have paid. An AirMedCare Network membership thus "travels" with the member.

46.  In West Virginia, Air Evac also sells memberships to businesses or to municipalities or counties. Businesses may either pay for their employees' memberships in a lump sum or have them

paid for through payroll deductions of enrolled employees. Over seventy West Virginia businesses, government entities, or associations make AirMedCare Network memberships available to their employees. This includes a city; three county boards of education; a deputy sheriff's association; two hospitals; and around fifteen fire departments.

47.    West Virginia counties and municipal entities may also purchase memberships on behalf of their residents ("Municipal Site Plan"). For a small annual fee based on the county or city's population, the Providers consider all air-ambulance charges that would otherwise be the patient's out-of-pocket responsibility to be prepaid—so long as the pickup location occurs within the designated geographic limits specified in the particular municipal membership agreement. Residents covered by a Municipal Site Plan may also upgrade their membership agreement to include air-ambulance transportation pickups from all areas served by Air Evac or any of the other Providers. Three West Virginia counties—Logan County, Wetzel County, and Tyler County—have purchased Municipal Site Plans. As a result, in 2020 every resident in each of these counties was covered by a membership purchased on their behalf by the county in which they reside.

48.    Wetzel County renewed its Municipal Site Plan for another year on February 4, 2021. Logan County's county-wide membership plan likewise renewed on March 16, 2021.

49.    Some 75,062 people in West Virginia are covered by the Membership Program. In 2020, Air Evac (or, in a few cases, the other Providers) performed approximately 152 transports for West Virginia members. On those flights, the transporting Providers cancelled a total of approximately $624,713 that the members would otherwise have had to pay out-of-pocket for the flights. That translates to an average of approximately $4,109 in debt written off per West Virginia member transport in 2020.

50.    In 2020, Air Evac earned approximately $784,865 in membership-related revenue from the sale of new memberships or the renewal of existing memberships in the State of West

Virginia.[1]

### C.    The Membership Program Is a Prepaid Service, or Debt Cancellation, Agreement.

51.    The Membership Program allows patients to partially prepay for a service provided by the air-ambulance provider. In essence, the membership program is a debt-cancellation agreement. Again, in exchange for the membership fee, if a member is transported by one of the Providers, whatever portion of that member-patient's debt remains after other third parties (such as insurers) have made their required payments will be cancelled by that Provider.

52.    The Membership Program is not an insurance policy. Specifically, the Terms and Conditions of Membership provide, "Membership is not an insurance policy and cannot be considered as a secondary insurance coverage or a supplement to any insurance coverage." Ex. G.

53.    Third-party transports are not covered. An AirMedCare Network membership applies only to member transports conducted by an air-ambulance company in the AirMedCare Network, which must be a wholly-owned subsidiary of AMGH.

54.    There is no guarantee of service. Members cannot contact Air Evac or any other AirMedCare Network Provider directly for transport when services are needed. When a third-party medical professional or first responder requests a Provider's service, the Provider does not know if the patient to be transported is a member. After the transport is complete, the Provider seeks payment. If the patient is a member, however, the portion of payment that would otherwise be the patient's out-of-pocket responsibility is cancelled—*i.e.*, considered prepaid—by the membership fee. Ex. G.

55.    Neither AirMedCare Network (which is not a legal entity) nor any of the Providers is required to indemnify or pay a specified amount to their members or to third-party air-ambulance

---

[1] Because of the Medicare rule against routine waivers of co-pays and deductibles, the aggregate membership fee collected by Air Evac each year for Medicare beneficiaries (or for all members) must be reasonably expected to be greater than the aggregate amount of charges written off for all Medicare beneficiary member (or all member) transports. *See* 68 Fed. Reg. 14,245, 14,253 (Mar. 24, 2003).

companies under any circumstances.

56.    The Providers offer memberships to all consumers, and do not employ actuarial or underwriting criteria—such as age, health status, geographical location, or available insurance coverage—to screen potential members or adjust the price of the membership. (However, the Providers do offer a discounted membership price for individuals over the age of 60, and the Providers cannot offer the membership to current Medicaid recipients.) Membership cost is determined solely by the value of the membership or—in the case of municipal memberships—by population. In states where the Membership Program is offered, a prospective member generally need only have a U.S. address, and not be a current Medicaid recipient, in order to purchase a membership agreement.

57.    When a customer purchases or renews an AirMedCare Network membership, the membership fee for each new member or renewal is initially collected by the legal entity Air Evac EMS, Inc., but is then swept into a "concentration" account maintained by the Providers' parent company (GMR). This account contains revenue from multiple sources, and the money it contains is used to fund the ongoing operations (payroll, aircraft fuel, etc.) of AMGH subsidiaries, including the Providers. On a monthly basis, membership fees are credited to the ledger account of the Provider that operates in the geographic region where a given membership was purchased. Membership fees are not pooled or placed in a reserve fund (in the manner of an insurance company) because, under the Membership Program, the Providers do not promise to pay money to members or any third-parties.

58.    None of the Providers makes any cash payment to any other Provider when a member is transported; AirMedCare Network (which is not a legal entity) does not make cash payments to any of the Providers when a member is transported; and neither Air Evac nor AirMedCare Network

reimburses or otherwise pays any Provider for transporting a member.[2]

### III.    Under the Airline Deregulation Act, States Cannot Regulate Air Evac's "Prices, Routes, or Services"

59.     Before 1978, the economic aspects of air transportation were regulated by the Civil Aeronautics Board ("CAB"), which "set[] strict rates for interstate passenger air travel." *Cheatham*, 910 F.3d at 755. In 1978, however, Congress determined that a market-based approach would best serve the industry and its customers. *Id.* at 756.

60.     Accordingly, Congress passed the ADA to "largely deregulate[] domestic air transport." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995). Congress phased out the CAB and, in its place, gave the federal DOT economic oversight authority over the industry, *Cheatham*, 910 F.3d at 756—with an explicit mandate to "promote maximum reliance on competitive market forces," 49 U.S.C. § 40101(a)(6), (a)(12).

61.     As part of this deregulatory effort, Congress included an express preemption provision in the ADA. 49 U.S.C. § 41713(b)(1). Under it, States "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier that may provide air transportation under this subpart." *Id.*

62.     This preemption provision reflects Congress's "broad preemptive purpose," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992), to "stop[] States from imposing their own substantive standards with respect to rates, routes, or services" of air carriers, *Wolens*, 513 U.S. at 232.

63.     By virtue of this express preemption provision, the ADA "displaces all state laws that fall within its sphere, even including state laws that are consistent" with the ADA, *Morales*, 504 U.S. at

---

[2] For internal purposes only, GMR tracks the performance of AirMedCare Network as a business unit, as well as tracking the performance of the different Providers. As part of this performance assessment, when a Provider transports a member, the Provider is assigned a $500 "credit" on its performance books, with a corresponding $500 "expense" to the performance books of AirMedCare Network. But this performance evaluation device does not represent an actual bank transfer or cash payment of any kind.

387 (cleaned up), so long as they have "the force and effect of law" and are "related to a price, route, or service" of an "air carrier," 49 U.S.C. § 41713(b)(1). The ADA thus "confers on private entities (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018).

64.    The first requirement for ADA preemption is that the regulated entity be an "air carrier" for purposes of the ADA. *See* 49 U.S.C. § 41713(b)(1). As already stated, the Fourth Circuit has held that Air Evac is an "air carrier." *Cheatham*, 910 F.3d at 764 ("On this question, the plain text of the law, the overall structure of the federal aviation laws, and the subsequent acts of Congress all point in the same direction: air ambulances are within the scope of the ADA."). This holding is consistent with other courts around the country. *See, e.g.*, *Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1059–61 (10th Cir. 2019); *Ferrell v. Air Evac EMS, Inc.*, 900 F.3d 602, 606–07 (8th Cir. 2018); *Bailey v. Rocky Mountain Holdings, LLC*, 889 F.3d 1259, 1272 (11th Cir. 2018).

65.    The second requirement for ADA preemption is that the challenged state law provision have the "force and effect of law." 49 U.S.C. § 41713(b)(1). A state law has this effect if it "imposes a "binding standard of conduct that operate[s] irrespective of any private agreement." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 282 (2014) (citing *Wolens*, 513 U.S. at 229 n.5).

66.    The third requirement for ADA preemption is that the challenged state law provision "relate[] to" an air carrier's prices or services. 49 U.S.C. § 41713(b)(1). As the Supreme Court has held, a state-law rule "relates to" an air carrier's prices or services if it expressly references them or if it has a significant economic effect on them. *Morales*, 504 U.S. at 388. And a law can "relate" to an air carrier's rates or services within the meaning of the ADA "even if the law is not specifically designed to affect [them], or the effect is only indirect." *Id.* at 386 (citation omitted).

67.    The ADA thus forbids states from capping, reducing, or regulating an air carrier's prices for its services. *See, e.g.*, *Cheatham*, 910 F.3d at 766–70; *Cox*, 868 F.3d at 902, 907; *EagleMed*, 227

17

F. Supp. 3d at 1275–81.

68.    In addition to preempting direct state regulation of prices, the ADA preempts state regulation of membership programs such as frequent flyer programs, through which members obtain access to advantageous fares or other privileges. That includes state laws that regulate the very same Membership Program at issue in this case, as this Court, the Fourth Circuit, and the Eighth Circuit have now held. *See Ginsberg*, 572 U.S. at 284 (claims involving frequent flyer programs "relate[d] to" the airline's rates because the program awarded "mileage credits" that "either eliminated or reduced" the cost of a ticket); *Wolens*, 513 U.S. at 226 (same); *Guardian Flight*, 991 F.3d at 921 (ADA preempts North Dakota law banning air-ambulance subscription agreements); *Cheatham*, 910 F.3d at 767–68 (ADA preempts law requiring air-ambulance providers to accept membership fees as "total reimbursement for state employees"); *Dodrill I*, 2021 WL 781679, at *7 (Defendant Dodrill's "effort to regulate Air Evac's Membership Program clearly relates to a price of an air carrier."); *Concovich v. Air Evac EMS, Inc.*, 2016 WL 843276, at *2 (S.D. Ill. 2016) (ADA preempts a state-law claim that "concerns the elimination of . . . a membership that reduces part of a rate" for air-ambulance services); Letter from D.J. Gribbin, Gen. Counsel, DOT, to Hon. Greg Abbott, Tex. Attorney Gen., at 9–12 (Nov. 3, 2008) ("Gribbin DOT Letter"), https://tinyurl.com/ycpx3zn6 (opining that ADA preempts Texas regulations of air-ambulance membership programs).  Instead, responsibility for oversight of such programs is committed to the Secretary of Transportation. *Morales*, 504 U.S. at 390–91.

69.    The ADA likewise preempts state laws that impose onerous economic regulatory requirements on air carriers that dictate the terms under which air carriers may offer and sell their services to potential customers, or impose onerous economic regulatory requirements on air carriers as a condition of entering a given market or offering their services to the public. *See Morales*, 504 U.S. at 378, 387–91 (ADA preempts state enforcement of standards governing the content and form of airline advertising); *Valley Med Flight, Inc. v. Dwelle*, 171 F. Supp. 3d 930, 940–42 (D.N.D. 2016) (ADA

preempts state law requiring air-ambulance providers to have in-network agreements with the state's largest insurer in order to be placed on a primary call list); *Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 727, 733–37 (E.D.N.C. 2008) (ADA preempts state law requiring air-ambulance provider to obtain a "certificate of need" from state regulators in order to operate in North Carolina); *Hiawatha Aviation of Rochester, Inc. v. Minnesota Dep't of Health*, 389 N.W.2d 507, 508–09 (Haw. 1986) (ADA preempts state law requiring federally-regulated air-ambulance provider to obtain a state license before operating in the state); Gribbin DOT Letter at 9–12 (opining that ADA preempts various Texas law requirements regulations of air-ambulance subscription programs that served as "prohibited barrier[s] to market entry").

### IV.    West Virginia's Insurance Licensing Regime

70.    As the Court is aware, West Virginia—like most states—defines "insurance" for purposes of state law and requires all those who engage in activities qualifying as "insurance" to obtain a state license. *See* W. Va. Code § 33-1-1 (defining "insurance"); W. Va. Code § 33-44-3(f) (similar); *see also* W. Va. Code §§ 33-1-10(b), 33-1-16, and 33-1-17 (defining "accident and sickness insurance," insurance "policy," and "premium").

71.    The Insurance Code then generally requires anyone who transacts insurance in West Virginia to be licensed by the Commissioner and submit to the dictates of the Insurance Code and the Commissioner's regulations. W. Va. Code §§ 33-3-1; § 33-44-1 *et seq.*[3] Again, this Complaint refers to newly-enacted HB 2766, in combination with Sections 33-3-1 and 33-44-1 *et seq.*, as the "Membership Laws."

72.    Entities deemed to be insurers must satisfy a series of requirements for obtaining a

---

[3] In *Dodrill I*, this Court preliminarily enjoined Defendant Dodrill from enforcing Sections 33-1-1; 33-3-1; and 33-44-1 *et seq.* against Air Evac. 2021 WL 781679, at *10. Defendant Dodrill has appealed the preliminary injunction. *See* Docket, *Air Evac EMS, Inc. v. James Dodrill*, No. 21-1301 (4th Cir. Mar. 19, 2021).

license from OIC and Defendant Dodrill. To obtain a license, an out-of-State applicant like Air Evac must potentially satisfy the following requirements, among others: (a) "Be an incorporated stock insurer, or an incorporated mutual insurer or a reciprocal insurer," W. Va. Code § 33-3-2(a); (b) Maintain minimum capital requirements of $1,000,000 and another $1,000,000 of "additional surplus funds," W. Va. Code § 33-3-5b(a)-(b); (c) Be authorized to transact insurance in the State of the out-of-state applicant's domicile, W. Va. Code §§ 33-3-2(c), 33-4-(e); (d) Submit copies of the applicant's charter, bylaws, and annual financial statement (among other things) to the Commissioner, W. Va. Code § 33-3-4; (e) Pay mandatory licensing and filing fees, W. Va. Code § 33-3-13(a); and (f) "Satisf[y]" the Commissioner that the applicant is in compliance with all relevant state laws, "and that such insurer is solvent and will transact insurance in a legal, proper and just manner," W. Va. Code § 33-3-7(a).

73. Licensed insurers are also required to submit to the applicable requirements of the West Virginia Insurance Code on an ongoing basis, as well as be subjected to OIC's ongoing oversight authority. *See, e.g.*, W. Va. Code § 33-3-8. To remain in good status with OIC and renew their status as insurers each year, licensees must potentially fulfill the following requirements, among others: (a) file annual statements with the Commissioner disclosing their "financial condition, transactions and affairs," W. Va. Code § 33-4-14; (b) annually file "a financial statement made under oath of its president or secretary and on a form prescribed" by OIC, W. Va. Code § 33-3-14(a); (c) self-report its gross amount of premiums and pay premium taxes imposed by the State, W. Va. Code §§ 33-3-14(a), 33-3-14a; (d) submit annual audited financial reports to the Commissioner, W. Va. Code § 33-3-1 *et seq.*; (e) conform its insurance policies to include the standard policy language and other requirements dictated by the Code, W. Va. Code §§ 33-6-1 *et seq.*; and (f) submit to OIC's regulatory authority over insurance rates, W. Va. Code §§ 33-16b-1 *et seq.*; 33-20-1 *et seq.*

74. This regime is backed by Defendant Dodrill's coercive power. Anyone who transacts insurance in West Virginia without a license faces civil penalties, criminal penalties, a cease-and-desist

order, and injunctive relief—all of which the State is authorized to seek. W. Va. Code §§ 33-11-7 (cease and desist order); 33-44-6 (injunctive relief); 33-44-7(a) (civil penalties of up to $20,000 for each unauthorized insurance transaction); 33-44-9 (criminal fines, 1-5 years' imprisonment, or both). Anyone who violates any other provision of the West Virginia Insurance Code is subject to a fine of up to $1,000, jail time, or both. W. Va. Code § 33-4-8.

75.     Subscription programs, like the one Air Evac offers in West Virginia as well as other states, are common to the air-ambulance industry. As discussed *supra* ¶¶ 36–58, Air Evac's program provides that a member pays a small fixed membership fee and, in exchange, upon the provision of transportation services, Air Evac and its sister Providers consider all air-ambulance charges not paid by a member's contractual insurance or responsible third party to be prepaid by the member. Ex. G. The membership program offered by Air Evac and the other Providers is not insurance. Its Terms and Conditions explicitly state as much.

76.     Numerous ground ambulances in West Virginia operate under a membership-based model similar to Air Evac's. For example, the Wetzel County Emergency Ambulance Authority offers a membership program that has terms and conditions similar to Air Evac's Membership Program— including cancelling any out-of-pocket obligation that would otherwise be owed by the patient. *See* Ex. H (Wetzel County Application); *see also Subscription*, White Sulphur Springs Emergency Medical Services, Inc., https://tinyurl.com/1b7mlt11 (last visited Feb. 8, 2021); *WVFD EMS Subscriptions*, Wilderness Volunteer Fire Department, https://tinyurl.com/11hl1c97 (last visited Feb. 8, 2021).

77.     Before the Commissioner initiated its - 2019 investigation into the Membership Program, neither Defendant nor any other West Virginia legal authority of which Air Evac is aware treated prepaid debt cancellation agreements directly between ambulance providers and their members as "insurance" under West Virginia law. Neither Defendant nor any other West Virginia legal authority had previously suggested that Air Evac—an air-ambulance provider—must register as an "insurer"

under West Virginia law. Indeed, as late as July 2019, OIC described air-ambulance membership programs in a consumer's guide brochure as "a limited discount program," not as "insurance." Ex. I (7/17/2019 email). This brochure also directed consumers to file any complaints with the *federal* Department of Transportation. *Id.*

78.    Similarly, and on information and belief, Defendant Dodrill and OIC have never formally applied or enforced the Insurance Code against ground ambulance membership programs.

## V.    Despite *Cheatham* and *Dodrill I*, West Virginia Enacts HB 2776 To Again Subject Air Evac's Membership Program to the Insurance Licensing Regime

### A.    The Federal Courts Reject West Virginia's First Attempt to Regulate Air Evac's Prices and Services, Including its Membership Program

79.    The *Cheatham* litigation arose when West Virginia officials—including OIC—embarked on a "regulatory scheme" intended to reduce air-ambulance reimbursements for transports provided to injured workers and to the State's own employees. *See Cheatham*, 910 F.3d at 767, 758. The Insurance Commissioner, and the Director of the Public Employees Insurance Agency (PEIA), used their statutory power to set fee schedules to set the reimbursement rate for air-ambulance providers at a steeply-discounted rate. *Id.* at 758, 767–68. In combination with bans on billing patients for the balance, the OIC and PEIA effectively capped air-ambulance reimbursement at an amount far below Air Evac's billed charges. *See id.*

80.    Separately, PEIA orchestrated the enactment of a new law in 2016 that (in addition to capping reimbursement rates for PEIA transports generally at the federal Medicare rate) also specifically targeted the Membership Program. That law, HB 4315, capped what Air Evac could receive for transporting PEIA insureds who belong to the Membership Program at the annual cost of Air Evac's membership program (which is generally less than $100, *supra* ¶ 39). HB 4315, Acts 2016, c. 130, *codified at* W. Va. Code § 5-16-8a(b) (eff. June 10, 2016 through June 3, 2019).

81.    In successfully urging the West Virginia Legislature to pass the 2016 law targeting Air

Evac's membership program, state officials worked in "close" connection with executives from HealthNet, a not-for-profit air-ambulance provider in West Virginia and Air Evac's competitor. Ex. J (9/12/2019 email) ("One thing that I didn't mention was SB 4315 from 2016. We worked close with Ted [Cheatham] (PEIA) and Governor Tomblin to support this bill. It ultimately passed"). Owned by a consortium of West Virginia medical centers, HealthNet operates air ambulances from ten bases, nine of which are in-state. *See* https://tinyurl.com/4pquj7h9.

82.    In 2016, Air Evac filed suit in the U.S. District Court for the Southern District of West Virginia, challenging this rate-capping scheme as preempted by the ADA. On October 20, 2017, the District Court held that "the ADA preempts" each of the State's rate-capping devices, including the newly-enacted membership law. *Cheatham*, 2017 WL 4765966, at *10. The District Court also enjoined the enforcement of the preempted laws and rules against air-ambulance providers. *Id.*

83.    In 2018, the Fourth Circuit unanimously affirmed that the ADA preempted the State's efforts to regulate Air Evac's prices for its services, including the statutory provision targeting Air Evac's membership program. *Cheatham*, 910 F.3d at 767–70. "There was nothing subtle or indirect about this approach," Judge Wilkinson wrote for the panel; "it was directly targeted at payments for air ambulance services." *Id.* at 767. "If such actions involving an air carrier are not 'related to price,' it is unclear what meaning the phrase would have left." *Id.* at 767–68.

84.    As a result of *Cheatham*, Defendant Dodrill is currently subject to a binding federal injunction forbidding him from applying workers'-compensation laws or fee schedules to regulate Air Evac's prices for its services. *See Cheatham*, 2017 WL 4765966, at *10.

> ### B.    In *Dodrill I*, This Court Rejects West Virginia's Second Attempt to Regulate Air Evac's Membership Program

85.    Not to be deterred, OIC responded to *Cheatham* with a new regulatory assault on Air Evac's Membership Program. As Air Evac has learned (primarily through FOIA requests), State

officials once again apparently did so in collaboration with Air Evac's competitor, HealthNet.[4]

86.    In May 2019, HealthNet executive Brian Doughty—at the request of an OIC employee—sent OIC copies of two of Air Evac's municipal membership contracts with Logan County, West Virginia, and Wetzel County, West Virginia. Ex. K (5/28/2019 email).

87.    In early June 2019, OIC's Director of Health Policy, Ellen J. Potter, sent Doughty an advance copy of a brochure OIC had developed containing information about air-ambulance membership programs. Ex. L (6/10/2019 email). Potter thanked Doughty for his "input on the brochure," which she said was "being printed." *Id.* Doughty replied to ask "how this will be distributed," then invited Potter "and [Potter's] team" to visit HealthNet's training center so that HealthNet could "share with you and your team our next steps as it relates to memberships." *Id.*

88.    On June 21, 2019, Defendant Dodrill emailed Doughty and Clinton Burley (another HealthNet executive) a message titled, "Air Ambulance Subscription Agreements." Ex. A. Defendant Dodrill said, "I wanted to let you know that I am considering whether to take action which could include issuance of a cease and desist order finding that the agreements already issued in WV are unapproved insurance products sold by unlicensed insurers/agents." *Id.* At that time, Air Evac had not been notified of any potential OIC proceeding.

89.    In mid-July 2019, OIC released the brochure on air-ambulance membership programs that it had drafted with the editing assistance of HealthNet, Air Evac's competitor. Ex. I. The brochure essentially consisted of a series of warnings about the perceived limitations of air-ambulance membership programs. *Id.* Notably, the brochure did not describe air-ambulance membership programs as insurance under West Virginia law. *See id.*; *see supra* ¶ 77 It also targeted only air-ambulance

---

[4] Further demonstrating West Virginia's recalcitrance: even after *Cheatham*, PEIA refuses to pay the balance of Air Evac's outstanding transport charges. That refusal—based in part on the assertion of sovereign immunity—is the subject of a separate state court proceeding. *Air Evac v. West Va. Public Employees Ins. Bd.*, *et al.*, Civil Action No.: 19-AA-169 (Cir. Ct. Kanawha Cty. 2020).

memberships, not any of the similar ground-ambulance memberships that exist in the state. *See supra* ¶¶ 76, 78.

90.    Also in July 2019, Doughty responded to inform Defendant Dodrill that HealthNet had an upcoming meeting with Senator Manchin, Senator Capito, and Congresswoman Miller to discuss air-ambulance issues in West Virginia. Ex. A. Doughty asked if there were "any updates on the membership discussions we've had" which he would be "happy to share" with the legislators. *Id.*

91.    In response, Defendant told Doughty and Burley, "I wish I could join you in D.C. to discuss this important issue with our delegation." *Id.* (7/19/19 email) He then told them that "I currently have my legal team looking into a two-pronged approach. First, I want to determine whether, under my existing statutory authority, I can take action now to shut down the subscription plans on the basis that they are unlicensed insurance products sold by unlicensed insurance producers. We know this will draw litigation." *Id.* He also explained that "I am working with the [National Association of Insurance Commissioners] on model legislation that we might be able to introduce in the upcoming legislative session," although "this prong does not look promising from a timing standpoint." *Id.* Defendant ended by extending "best wishes for a successful round of meetings next week." *Id.*

92.    On September 10, 2019, Doughty and Joshua Gillespie of HealthNet met with the Roane County Chamber of Commerce and delivered a presentation discussing "countywide membership contract[s]" as well as HealthNet's own "options available to the public." Ex. J. Doughty also apparently informed members of the Roane County Chamber of Commerce about "the WV Insurance Commissioners [sic] involvement with the Air Evac membership product"—information that Air Evac itself was unaware of and was not yet known to the public. *Id.*

93.    On September 17, 2019—just a week after Doughty's presentation—OIC served Air Evac with a discovery subpoena and a notice of investigative hearing on the Membership Program's status under the West Virginia insurance laws. Ex. M (First Notice of hearing/Discovery Request).

94.    In response to OIC's discovery requests, Air Evac provided OIC with the information requested, but "object[ed] to this Administrative Proceeding in its entirety because [the ADA] precludes the application of state insurance laws . . . to Air Evac's membership program."

95.    On February 6, 2020, an investigative hearing was held at which OIC officials deposed two Air Evac employees regarding the operations of the Membership Program. At this hearing, Air Evac's counsel again objected that "this entire proceeding is preempted" under the ADA. Air Evac's counsel also objected that certain documents, including ones Air Evac obtained through a FOIA request before the hearing, show "in no uncertain terms that . . . this investigation . . . has been orchestrated in no small part with one of our private commercial competitors in the State of West Virginia; a fact that undoubtedly casts a shadow on this entire proceeding and warrants our objection on the record." The OIC hearing examiner allowed the depositions to go forward.

96.    After the February 6 hearing, OIC served Air Evac with a second set of discovery requests. Air Evac complied with OIC's request in April 2020, while again objecting that the ADA deprived the Commissioner of any authority over the Membership Program.

97.    On December 29, 2020 (over fifteen months after Air Evac was first notified of the investigation, and approximately eight months after Air Evac had responded to OIC's last subpoena), OIC notified Air Evac that it was initiating an administrative enforcement action against the company. Ex. N (Admin. Complaint and Notice of Hearing). OIC's Legal Division concluded that Air Evac's Membership Program constituted the unauthorized transaction of insurance in West Virginia, and sought a cease-and-desist order and fines of up to $20,00 per violation against Air Evac for each alleged violation of West Virginia's insurance laws. OIC later informed Air Evac that Defendant Dodrill himself would preside over the hearing and rule over the matter himself (as opposed to a hearing examiner).

98.    After Air Evac sought emergency relief in federal court, this Court issued a preliminary

injunction forbidding Defendant Dodrill from enforcing the challenged provisions of the Insurance Code against Air Evac. *Dodrill I*, 2021 WL 781679, at *10. This Court reasoned that Air Evac was likely to succeed on the merits in showing that the ADA preempts the application of West Virginia's insurance-licensing regime to the Membership Program. *Id.* at *7–9. The Court found that Air Evac would be irreparably harmed if the challenged laws, and Defendant Dodrill's efforts to enforce them, were not enjoined. *Id.* at *9. And the Court observed that the timing and circumstances of the Commissioner's investigation into the Membership Program were "troubling"; that the Commissioner's investigation "smack[ed] of gamesmanship" to evade the Fourth Circuit's ruling in *Cheatham*; and that OIC's efforts to hamstring the Membership Program are "puzzling." *Id.* at *6, *10.

99.     That case is stayed pending resolution of Defendant Dodrill's pending appeal to the Fourth Circuit. *See Air Evac EMS, Inc. v. Dodrill*, Order, ECF No. 29 (Mar. 31, 2021).

### C.     West Virginia Enacts HB 2776, At Defendant Dodrill's Urging, to Again Regulate the Membership Program as Insurance

100.     In parallel with the administrative proceeding that this Court enjoined in *Dodrill I*, OIC and Defendant Dodrill pushed forward with the second "prong" of their campaign to regulate Air Evac's Membership Program out of existence. *Supra* ¶ 91. That took the form of HB 2776—one of the Membership Laws at issue in this suit. HB 2776 once again purports to define Air Evac's Membership Program as "insurance," supposedly placing it under the statutory and regulatory authority of Commissioner Dodrill. Ex. B.

101.     HB 2776 is apparently intended as a vehicle for Defendant Dodrill to circumvent this Court's injunction as well as the Eighth Circuit's recent ruling in *Guardian Flight v. Godfread*, 991 F.3d 916 (8th Cir. 2021). As Air Evac has learned (in part through FOIA requests), HB 2776 was drafted by Air Evac's in-State competitor, HealthNet; OIC was involved in the legislative process from beginning to end; and Defendant Dodrill actively and successfully lobbied the Legislature to pass the bill.

102.    HB 2776 had its genesis in Defendant Dodrill's efforts to work with the National Council of Insurance Legislators (NCOIL) and the National Association of Insurance Commissioners (NAIC), to craft model legislation for state legislatures to use in classifying air-ambulance memberships as insurance and regulating them as insurance products. Ex. C (3/9 Hearing 23:10-17).

103.    HealthNet drafted HB 2776 in December 2020 to match that model legislation. OIC was given an advance copy of the draft and the opportunity to provide comments and edits.

104.    Specifically, on December 23, 2020, Jason Pizatella—a HealthNet lobbyist—emailed Erin Hunter, the Deputy Insurance Commissioner and General Counsel of OIC. Mr. Pizatella thanked Ms. Hunter "for your voicemail the other day," and attached a draft of what would later be introduced as HB 2776. Ex. O (12/23/20 email). The title of the attached draft was "HealthNet_AirMethods_Air Ambulance Protection Act_2021." *Id.* Air Methods is a nationwide competitor of Air Evac's that provides aviation service for HealthNet and would later join HealthNet in actively lobbing in support of HB 2776. *See* Ex. R at 43:2–6; 47:17–20 (April 2021 Hearing Transcript).

105.    Mr. Pizatella wrote, "Attached is the draft I came up with, which I believe is consistent with the provisions of the NCOIL model act. Any comments you may have are most welcome." Ex. O; *see also id.* (emailing a slightly-revised draft of the bill to Ms. Hunter on December 29, 2020).

106.    The bill was introduced (in materially similar form) as HB 2776 two months later, on February 26, 2021. That same day, OIC's Ms. Hunter received an email titled "HB2776" from the chief counsel of the West Virginia House Committee on Health and Human Resources (the new bill's first stopping place after its introduction). Ex. P (3/1/21 email chain). He told Ms. Hunter, "Send me your changes." *Id.* Ms. Hunter responded, "We have no suggested comments/changes." *Id.*

107.    On March 1, 2021, this Court issued a preliminary injunction on the ground that the ADA likely preempts West Virginia's insurance laws as applied to Air Evac. *See Dodrill I*, 2021 WL 781769, at *10.

108.    On March 9, 2021, HB 2776 came up for hearing before the House Judiciary Committee. Commissioner Dodrill, as well as HealthNet's Clinton Burley, testified at the hearing.

109.    At the House hearing, Defendant Dodrill admitted that OIC "had consultation with the sponsor of the bill." Ex. C (3/9 Hearing 21:2–3). He also admitted that "[t]here is pending litigation wherein I am the Defendant in federal court" in which Air Evac "sought to stop our process of determining whether or not under current West Virginia law, the - - these memberships constitute insurance." *Id.* 18:22–19:2. And he agreed with a legislator that this Court "is already on record stating that there's a high likelihood that this would not be a valid bill." *Id.* 28:6–12.

110.    However, Defendant Dodrill argued that if HB 2776 passed, the case pending in front of this Court would become "moot" or be "negate[d]." *Id.* 19:8–13; 20:11–14. According to Defendant Dodrill, this Court's ruling in *Dodrill I* held that the ADA preempted "current West Virginia law" regulating the Membership Program as "insurance," "but this bill would make it clear or change West Virginia law and make it a legislative declaration that in fact it is insurance." *Id.* 28:11–15.

111.    When a legislator asked "about how many companies are out there that are providing" membership programs subject to the new bill, Defendant Dodrill replied, "In West Virginia, I think there's only one." *Id.* 21:16–20; *see also id.* 36:11-19 (Ms. Hunter's testimony to the same effect). That is Air Evac.

112.    One legislator asked whether the legislator would still "be able to buy" a membership "for $85 bucks a year" if HB 2776 passed. *Id.* 34:3–6. Defendant Dodrill responded that "what we're going to do if this passes . . . is to regulate this *as we do every other insurance product out there*, without any bias or prejudice in any way, shape, or form, and that's all I can tell you. How it shakes out in the end after we do - - after we take a look at the companies that want to offer it and their financial security and make sure there are adequate consumer protections in place, I honestly can't tell you." *Id.* 34:7–17 (emphasis added); *see also id.* at 30:16–23 (Dodrill testifying that if HB 2776 passed, OIC would

ensure that air-ambulance memberships are regulated "just like other insurance").

113.    On March 17th, 2021, the same day HB 2776 was introduced in the Senate, the Eighth Circuit issued its ruling in the *Guardian Flight* case, unanimously agreeing with this Court that the ADA preempts state laws banning the Membership Program and that such laws do not have the purpose of regulating the "business of insurance," so they are not saved by the McCarran-Ferguson Act. 991 F.3d at 923–24.

114.    Accordingly, HealthNet drafted amendments to HB 2776 endeavoring to circumvent *that* federal ruling as well. On April 1, 2021, the Senate Judiciary Committee's counsel reached out to OIC's Erin Hunter attaching "some proposed language that Jason Pizatella [HealthNet's lobbyist] sent to me." Ex. Q [4/1/21 email]. Mr. Pizatella believed that this amendment would enable HB 2776 to "avoid the fate befalling the regs in the 8th Circuit." *Id.*

115.    The Senate Judiciary Committee held a hearing on HB 2776, and the proposed amendment, on April 7, 2021. Ex. R.

116.    The Committee heard supporting testimony from HealthNet's lobbyist, Mr. Pizatella; HealthNet's executives, Mr. Doughty and Mr. Burley; a lobbyist representing one of HealthNet's owners, Mountain Health Network; and both a lobbyist and a government affairs representative from Air Methods, the private air-ambulance company that partners with HealthNet (Ethan Wilson and Ruthie Barko, respectively). *Id.*

117.    According to Delegate Westfall, one of the bill's co-sponsors, the "intent of this bill is to let the Insurance Commissioner to set rules and promulgate rules and regulate this industry. . . . I think [an air-ambulance membership is] an insurance policy that's not being regulated by the Insurance Commissioner. . . . I think it's important to get this under regulation of the Insurance Commissioner. That's pretty much all this does." Ex. R (4/7 Hearing 8:13–19, 9:2–4).

118.    A representative of Air Evac, Joe Ward, warned the Committee members that "there's

nothing in this [amendment] that's going to save the legislation from being found to be preempted," and that HB 2776 is squarely foreclosed by this Court's ruling in *Dodrill I* and the Eight Circuit's ruling in *Guardian Flight*. *Id.* 16:19–20:23. Mr. Ward explained that "at its heart," HB 2776 "is an anti-competitive measure" that's "going to put one of West Virginia's air ambulance providers under regulation of the state with regards to a product that they have innovated, and they have offered and it's not going to affect the only other provider in the state." The result, he explained, would to "eliminate competition from the marketplace," and "that means one thing and one thing only: high prices for the consumer." *Id.* 26:11–22.

119.    HealthNet's witnesses assured the Senate Committee that this Court's injunction, which enjoined OIC's first attempt to regulate the Membership as "insurance," would be no obstacle to HB 2776, even though the new law purported to do the same thing. According to Mr. Burley, "There are no implications" under the ADA "related to this legislation. It's very clear that this product indemnifies members from any type of extra payment beyond that which their insurance pays. It acts like insurance. They're in the business of insurance, but presently, it's not regulated." *Id.* 14:9–16.

120.    HealthNet's lobbyist, Mr. Pizatella, was asked about the pending *Dodrill I* litigation and whether "we're trying to preempt the judicial outcome of that litigation by passing this bill." *Id.* 58:15–20. Mr. Pizatella told the Committee (incorrectly) that this Court had stayed its injunction pending appeal; that this Court's ruling did not affect Defendant Dodrill's regulatory authority to classify the Membership Program as "insurance"; and that "[j]ust because the judge says a party is likely to prevail on the merits does not mean that they will." *Id.* 58:21–59:18.

121.    A lobbyist for Air Methods—HealthNet's business partner and Air Evac's nationwide competitor—testified in support of HB 2776. He explained at length that the bill amendments were designed to circumvent the Eighth Circuit's *Guardian Flight* decision. *See id.* at 29:09–37:05 (testimony of Ethan Wilson).

122.    Although Commissioner Dodrill did not testify at the April 9 Senate Judiciary hearing, the day after the hearing he drafted and personally oversaw the distribution of a letter to every senator urging passage of HB 2776. Ex. S (4/8/2021 email and attached letter). He told his staff to deliver the letter to the senators' Capitol offices after printing it "on better paper if available." *Id.*

123.    In his letter, Defendant Dodrill stated that HB 2776 would "confirm that air ambulance subscriptions are, in fact, insurance." Ex. S. "[I]f the product is insurance, it will give the State the ability to require the product's compliance with existing insurance laws and put consumer protections in place that already exist for other insurance products." *Id.* Dodrill ending the letter by asking (rhetorically) whether he believed "it is imperative" that air-ambulance membership programs be regulated as insurance. "Absolutely." *Id.*

124.    HB 2776 was enacted on April 10, 2021, and signed by the Governor on April 28, 2021. It becomes effective on July 9, 2021 (or 90 days after its passage). *See* W.V. Legis., *Bill Status – 2021 Reg. Sess.*, HB 2776, http://www.wvlegislature.gov/Bill_status/bills_history.cfm?INPUT= 2776&year=2021&sessiontype=RS (last visited May 18, 2021).

125.    HB 2776 contains multiple provisions. *First*, it declares that "[a]n air ambulance service provider or any affiliated entity who solicits air ambulance membership subscriptions, accepts membership applications, or charges membership fees, is deemed to be engaged in the business of insurance to the extent that it contracts, promises, guarantees, or in any other way portends to pay, reimburse, or indemnify the copayments, deductibles, or other cost-sharing amounts of a patient relating to the air ambulance transport as determined or set by the patient's health insurance provider, health care provider, or other third parties, or any post-service payment of costs to third parties relating to the transport." W. Va. Code § 33-11B-1(a).

126.    *Second*, HB 2776 declares that any such membership program "is insurance and may be considered secondary insurance coverage or a supplement to any insurance coverage, and shall b[e]

32

subject to regulation by the commissioner pursuant to the provisions of" the Insurance Code. W. Va. Code § 33-11B-1(b).

127.    *Third*, HB 2776 states that any person or entity engaged in activity covered by the statute cannot "solicit or sell air ambulance membership agreements or subscriptions, accept membership applications, or charge membership fees except as authorized by a valid license issued by the commissioner pursuant to the provisions of this chapter." W. Va. Code § 33-11B-1(c).

128.    HB 2776 also empowers Defendant Dodrill to promulgate rules to "effectuate" its "provisions." W. Va. Code § 33-11B-1(d).

129.    Defendant Dodrill has repeatedly stated his intention to rely on HB 2776 to regulate Air Evac and its membership. *Supra* ¶¶ 110-112, 122-23.

130.    Under the Membership Laws as construed by the Commissioner, Air Evac and its Membership Program will once again be subject to the licensing and regulatory regime described above, and which this Court already held is likely preempted in *Dodrill I. Supra* ¶¶ 70–74. Specifically, Air Evac will be restricted—on pain of penalties enforced by Defendant Dodrill—from offering or selling memberships for prepaid, discounted air-ambulance services to West Virginia residents unless it obtains and maintains an insurance license, and maintains regulatory approval from the Commissioner. And unless Air Evac submits to these requirements, it will be subjected to penalties and other forms of reprisal at Defendant Dodrill's hands for the unauthorized sale of insurance.

131.    The Membership Laws would bar Air Evac from charging prepaid, discounted prices for its services unless Air Evac satisfies costly and onerous regulatory pre-conditions for entering the market.  The Membership Laws regulate the manner and terms under which Air Evac may offer and sell its transportation services to the public, and effectively bar Air Evac from an entire way of structuring and collecting payment for its services as an air carrier. Not complying with the Membership Laws would subject Air Evac to (among other things) fines and criminal penalties.

132.   Air Evac is a provider of air medical transportation, not an insurance company. Air Evac is not structured to operate as an insurance company or to comply with the various regulatory requirements that West Virginia law requires insurers to satisfy in order to obtain and maintain an insurance license. Complying with the Membership Laws would be costly, time-consuming, and require significant restructuring of Air Evac's basic operations. If the Membership Laws apply to Air Evac, Air Evac would be compelled to cease offering memberships in West Virginia—as Air Evac and the other Providers have been forced to do in other states under these circumstances.

### D.   The ADA Preempts the Membership Laws as Applied to Air Evac

133.   The Membership Laws have the force and effect of law, directly relate to Air Evac's prices and services, and are preempted by 49 U.S.C. § 41713(b)(1). *See Wolens*, 513 U.S. at 226 (state-law provision affecting frequent-flyer membership program is preempted under the ADA); *Guardian Flight*, 991 F.3d at 921–24 (ADA preempts North Dakota law banning the Membership Program); *Cheatham*, 910 F.3d at 767–68 (state law relating to air-ambulance membership program is preempted under the ADA); *Dodrill I*, 2021 WL 781679, at *7–10 (finding Air Evac likely to succeed in showing that the ADA preempts Defendant Dodrill's attempts to enforce state insurance laws against Air Evac's Membership Program); *supra* ¶¶ 59–69.

134.   Under the Membership Laws, Air Evac is forbidden from seeking payment from a member's commercial insurer unless Air Evac obtains an insurance license from Defendant Dodrill and complies with the dictates of the West Virginia Insurance Code.

135.   The Memberships Laws are—in effect—identical to the combination of West Virginia insurance laws whose application and enforcement this Court enjoined in *Dodrill I*. In *Dodrill I*, Defendant attempted to use his regulatory authority to define the Membership Program as "insurance" under the general statutory definition of that term, which would then trigger the Insurance Code's licensing and enforcement provisions and apply them with full force to Air Evac. Similarly,

HB 2776 purports to define Air Evac's Membership Program as "insurance" as a statutory matter, and requires Air Evac to obtain an insurance license from the Commissioner in order to operate the program in West Virginia. As in *Dodrill I*, HB 2776 thus triggers the application of equally-preempted existing laws to Air Evac that would require Air Evac to: (1) comply with costly and onerous regulatory requirements in order to obtain and maintain an insurance license and remain in good standing with OIC, and (2) otherwise face exposure to penalties and other enforcement action for operating as an unauthorized insurer.

136.    Like the laws held preempted in *Cheatham* and *Dodrill I*, the Membership Laws impermissibly regulate the billing relationship between Air Evac and its potential passengers and override Air Evac's business judgment as to whether and how to recoup the balance of its charges from its potential passengers.

137.    Defendant Dodrill and HB 2776's proponents have stated the view that the Membership Laws may be saved from ADA preemption by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) ("MFA"). That statute provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). It thus establishes a narrow exception to federal preemption for state laws regulating the "business of insurance."

138.    The MFA does not save the Membership Laws from ADA preemption. The MFA has been displaced by the ADA, which expressly clarifies that all State laws directed at an air carrier's prices or services—whether insurance-related or not—are preempted, "[e]xcept as provided in" the ADA itself. 49 U.S.C. § 41713(b)(1); *see Bailey v. Rocky Mountain Holdings, LLC*, 136 F. Supp. 3d 1376, 1381–82 (S.D. Fla. 2015), *aff'd*, 889 F.3d 1259 (11th Cir. 2018).

139.    In addition, and as this Court already recognized in *Dodrill I*, prepaid medical services

plans and debt-cancellation agreements, such as the Membership Program, do not qualify as the "business of insurance" within the meaning of the MFA. That is because they involve no promise to indemnify subscribers and therefore implicate none of the concerns that motivated the Congress that enacted the MFA, including guaranteeing that insurers remain solvent to pay out claims. *Guardian Flight*, 991 F.3d at 921-24 (MFA did not apply to North Dakota law banning Guardian Flight's Membership Program); *Dodrill I*, 2021 WL 781679, at *9 ("Air Evac is likely to prevail in demonstrating that its Membership Program is not insurance" under the MFA); *see Group Life & Health Ins. Co. v. Royal Drug. Co.*, 440 U.S. 205, 225–30 (1979); *Anglin v. Blue Shield of Va.*, 693 F.2d 315, 317–18 (4th Cir. 1982); *First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 779–80 (8th Cir. 1990); *FTC v. IAB Marketing Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014).

140.    Defendant Dodrill and the members of the West Virginia Legislature apparently believe they can circumvent the MFA by expressly deeming the Membership Program to be insurance as a matter of state law. *See, e.g.*, Ex. C at 20:5–10 (March 2021 Hearing). But the meaning of the "business of insurance" is a question of federal—not state—law. *See, e.g., Blackfeet Nat. Bank v. Nelson*, 171 F.3d 1237, 1245 (11th Cir. 1999) ("The meaning of 'insurance' in the context of McCarran-Ferguson is a federal question"). Accordingly, HB 2776 and the other Membership Laws are preempted by the ADA, and not saved by the MFA, for precisely the same reasons that this Court has previously held. *Dodrill I*, 2021 WL 781679, at *9–*10.

### E.    Air Evac Will Be Irreparably Harmed If the Membership Laws are Not Declared Preempted and Enjoined Before HB 2776's Effective Date

141.    HB 2776 goes into effect on July 9. As explained more fully in Air Evac's accompanying Motion for a Preliminary Injunction and supporting Memorandum, all of the elements for preliminary injunctive relief are met, and this Court should issue a preliminary injunction barring the new law's application to Air Evac.

142.    Air Evac is likely to succeed on the merits on its claim that the ADA preempts the

Membership Laws as applied to the Membership Program. Indeed, both this Court and the Fourth Circuit have already ruled that the ADA forbids States from regulating Air Evac's relationship with its members under this exact same program.

143.    Air Evac will also be irreparably harmed absent a preliminary and permanent injunction. *First,* as a federally-regulated air carrier, Air Evac is entitled to have its prices, services, and economic relationship with its members regulated solely under federal law—not by a state regulator applying state law. Being forced to choose between complying with a preempted state law, or defying state law and risk incurring penalties or other forms of enforcement at the hands of state regulators, is itself an irreparable harm.

144.    *Second*, in the absence of preliminary and permanent injunctive relief, Air Evac will incur significant and irreparable monetary losses and irreversible disruption of its relationships with members. As soon as July 9, 2021, which is HB 2776's effective date, Air Evac could be subject to significant penalties or other enforcement action at Defendant Dodrill's hands if it continues operating the Membership Program in West Virginia without a license. As such, Air Evac will be forced to stop offering the Program in order to comply with the law. That will result in the loss of revenue that Air Evac cannot recover, even if it ultimately prevails on its ADA preemption argument at some point in the future, due to the State's immunity from suit: lost revenue from unsold memberships, lost revenue from un-renewed memberships, and lost revenue due to refunds requested by existing members. Moreover, if Air Evac is forced to cease operating the Membership Program even temporarily, this will likely cost Air Evac its hard-won relationship with the Counties with whom it has Municipal Site Plans. If Air Evac is precluded from offering memberships for a period of months or years, it will be difficult to reestablish these relationships.

145.    *Third*, the only alternative to ceasing to offer memberships would be for Air Evac to sell memberships despite the Membership Laws, trusting its preemption arguments will one day be

vindicated. But that, too, threatens Air Evac with irreparable harm. If Air Evac violates the Membership Laws, OIC could impose civil penalties of up to $20,000 per transaction—monetary damages that, again, likely cannot be recovered due to sovereign immunity. Air Evac's ability to operate the Membership Program, retain existing members, and attract new members will also be severely undermined by the perception that the Program operates under a cloud of illegality and is subject to potential enforcement action at the hands of Defendant Dodrill. In light of West Virginia's ongoing efforts to regulate the Membership Program as "insurance," including House Bill 2776, multiple holders of AirMedCare Network membership contracts (including businesses and municipalities) have contacted Air Evac to inquire about and express concerns over the continued status of the Membership Program in West Virginia.

146.    Equity and the public interest also favor the swift resolution and vindication of Air Evac's rights under federal law. If Air Evac is forced to cease offering memberships in West Virginia on July 9, 2021 (or at any time thereafter), West Virginia municipalities, fire departments, and citizens will be deprived of more affordable access to Air Evac's emergency air-ambulance transportation. West Virginia residents will lose the opportunity as members to have the out-of-pocket balance of their bill cancelled if they are transported by Air Evac or one of its sister Providers. In 2020 alone, Air Evac and the other Providers cancelled over $600,000 in transport debt for their West Virginia members. Moreover, if Air Evac ceases selling memberships in Wet Virginia, its Membership Sales Managers' positions will likely be eliminated, as will Air Evac's relationship with the 30 Independent Representatives who sell memberships in the state—potentially depriving these individuals of a source of income during a serious public health crisis and economic downturn.

147.    By contrast, Defendant Dodrill will not be harmed if he is temporarily barred from enforcing the Membership Laws, and can resume enforcement if Air Evac's federal claim fails.

## CLAIM FOR RELIEF

### Declaratory and Injunctive Relief Based on ADA Preemption

148.    Paragraphs 1 through 147 are re-alleged and incorporated here by reference.

149.    At issue is Air Evac's ability to maintain a membership plan in West Virginia allowing members to prepay for air-ambulance services at a discounted price unless Air Evac obtains regulatory approval from the Department to operate as a licensed insurer, and submits to the attendant regulatory requirements imposed by West Virginia.

150.    Defendant, as Insurance Commissioner, has the duty and authority to enforce the Membership Laws through the pursuit of cease-and-desist orders, civil penalties, injunctive relief, and criminal penalties in both administrative and judicial actions. Defendant has already initiated an investigation and proposed state administrative enforcement proceeding against Air Evac in the past. Defendant has also unmistakably indicated his intention to apply the Membership Laws to Air Evac.

151.    Under the Membership Laws as applied and interpreted by Defendant Dodrill, Air Evac is restricted from offering or selling memberships for prepaid, discounted air-ambulance services to West Virginia residents unless Air Evac obtains and maintains regulatory approval from the Commissioner. As applied, the Membership Laws directly relate to the price Air Evac can charge for its air transportation services as well as the manner and terms under which it can collect payment for those services. Under 49 U.S.C. § 41713(b)(1), West Virginia is prohibited from enacting and enforcing state laws or regulations that relate to Air Evac's prices and services.

152.    Apart from a declaration that the Membership Laws are preempted and an injunction forbidding their enforcement, Air Evac has no adequate remedy at law. The balance of harms weighs in favor of such relief, and this relief serves the public interest.

153.    Air Evac accordingly requests that this Court declare the Membership Laws (HB 2776, to be codified at W. Va. Code § 33-11B-1; W. Va. Code § 33-3-1; W. Va. Code § 33-44-1 *et seq.*), to be

preempted by 49 U.S.C. § 41713(b)(1), and unenforceable as they relate to Air Evac, and to permanently enjoin Defendant Dodrill from enforcing the Membership Laws against Air Evac. *See* U.S. Const. art. VI; 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

WHEREFORE, Air Evac respectfully asks that the Court:

1. Issue, after a hearing, a preliminary injunction barring Defendant Dodrill from enforcing HB 2776 (*to be codified at* W. Va. Code § 33-11B-1); W. Va. Code § 33-3-1; and W. Va. Code § 33-44-1 *et seq.*, against Air Evac;

2. Issue a judgment declaring that the ADA preempts HB 2776 (*to be codified at* W. Va. Code § 33-11B-1); W. Va. Code § 33-3-1; and W. Va. Code § 33-44-1 *et seq.*, as applied to air-ambulance providers;

3. Permanently enjoin Defendant Dodrill from enforcing HB 2776 (*to be codified at* W. Va. Code § 33-11B-1); W. Va. Code § 33-3-1; and W. Va. Code § 33-44-1 *et seq.*, against air-ambulance providers because those provisions are preempted by the ADA;

4. Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Carte P. Goodwin
Carte P. Goodwin (WV Bar No. 8039)
Alex J. Zurbuch (WV Bar No. 12838)
FROST BROWN TODD, LLC
500 Virginia Street, East, Suite 1101
Charleston, West Virginia 25301-3207
Tel.: (304) 348-2422
cgoodwin@fbtlaw.com
azurbuch@ftblaw.com

Joshua L. Fuchs (TX Bar No. #24029559)
*pro hac vice motion forthcoming*
Nicole M. Perry (TX Bar No. 24056367)
*pro hac vice motion forthcoming*
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002-2712
Tel.:  (832) 239-3939
Fax:  (832) 239-3600
jlfuchs@jonesday.com

Charlotte H. Taylor (DC Bar No. 1024658)
*pro hac vice motion forthcoming*
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001-2113
Tel.:  (202) 879-3939
Fax:  (202) 626-1700
ctaylor@jonesday.com

*Attorneys for Plaintiff*